# SUPREME COURT OF THE UNITED STATES

No. 24A1079

### KRISTI NOEM, SECRETARY, DEPARTMENT OF HOME-LAND SECURITY *v.* SVITLANA DOE, ET AL.

ON APPLICATION FOR STAY

[May 30, 2025]

The application for stay presented to JUSTICE JACKSON and by her referred to the Court is granted. The April 15, 2025 order entered by the United States District Court for the District of Massachusetts, case No. 1:25–cv–10495, is stayed pending the disposition of the appeal in the United States Court of Appeals for the First Circuit and disposition of a petition for a writ of certiorari, if such a writ is timely sought. Should certiorari be denied, this stay shall terminate automatically. In the event certiorari is granted, the stay shall terminate upon the sending down of the judgment of this Court.

JUSTICE JACKSON, with whom JUSTICE SOTOMAYOR joins, dissenting from the grant of the application for a stay.

When this Court evaluates whether or not to stay a lower court's order, the factors we apply are well established: The applicant must show a fair prospect that we will grant certiorari and reverse, that the merits favor them, that irreparable harm will befall them should we deny the stay, and, in close cases, that the equities and public interest are on their side. See *Hollingsworth* v. *Perry*, 558 U. S. 183, 190 (2010) (*per curiam*); *Maryland* v. *King*, 567 U. S. 1301, 1302 (2012) (ROBERTS, C. J., in chambers); see also *Nken* v. *Holder*, 556 U. S. 418, 434 (2009). In any given case, each of these considerations bears on the appropriateness of the

requested intervention and is a prerequisite to obtaining relief.

The Court has plainly botched this assessment today. It requires next to nothing from the Government with respect to irreparable harm. And it undervalues the devastating consequences of allowing the Government to precipitously upend the lives and livelihoods of nearly half a million noncitizens while their legal claims are pending. Even if the Government is likely to win on the merits, in our legal system, success takes time and the stay standards require more than anticipated victory. I would have denied the Government's application because its harm-related showing is patently insufficient. The balance of the equities also weighs heavily in respondents' favor. While it is apparent that the Government seeks a stay to enable it to inflict maximum predecision damage, court-ordered stays exist to minimize—not maximize—harm to litigating parties.

## I
### A

Nearly half a million Cuban, Haitian, Nicaraguan, and Venezuelan noncitizens are presently in the United States, after fleeing their home countries, by virtue of temporary permission granted to them by the Department of Homeland Security (DHS). Under the "CHNV" program, individuals from these conflict-ridden countries receive "parole" status for up to two years, which allows them to live in the United States and, in some cases, work here lawfully. Parole is discretionary by statute. DHS awards parole status through a competitive and detailed application process that involves a rigorous, individualized assessment of the applicant's circumstances.

On January 20, 2025, the President issued an Executive Order that instructed the DHS Secretary to "[t]erminate all categorical parole programs," including CHNV. Exec. Order No. 14165, §7(b), 90 Fed. Reg. 8468. DHS thereafter

announced the termination of the lawful status of all CHNV parolees in one fell swoop, through a single Federal Register Notice. 90 Fed. Reg. 13611.

Respondents, who had already filed a putative class action in the District of Massachusetts, amended their complaint to challenge the DHS Notice. They alleged, as relevant, that the Secretary had acted arbitrarily and capriciously, contrary to law, and in excess of her legal authority by prematurely terminating their parole. See Second Amended Complaint in No. 1:25–cv–10495 (D Mass.), ECF Doc. 68, p. 101, ¶4. The District Court temporarily stayed DHS's Notice; in its view, *inter alia*, the federal statute requires that parole terminations occur on a case-by-case basis, rather than en masse. \_\_\_ F. Supp. 3d \_\_\_, \_\_\_ (Mass. 2025), App. to Application for Stay 36a (App.); see also 8 U. S. C. §1182(d)(5)(A). The First Circuit declined to disturb that decision pending appeal but invited "[a]ny party intending to seek expedited briefing of the merits" to "file an appropriate motion as soon as practicable." App. 46a. Rebuffing the First Circuit's invitation, the Government filed a stay application with us.

B

The decision whether to stay a lower court's order does not reflect a back-of-the-napkin assessment of which party has the better legal argument. Rather, "the dilemma [that] stays historically addressed" was "what to do when there is insufficient time to resolve the merits and irreparable harm may result from delay." *Nken*, 556 U. S., at 432. The central question, then, is whether the applicant can be made to wait until the conclusion of the litigation to vindicate their purported legal rights, or whether irreparable harm will befall the applicant in the interim such that the court must act early to stave off that damage, for equity's sake.

Consistent with this principle, this Court has long understood that the "authority to grant stays" is only justified by

the "need 'to prevent irreparable injury to the parties or to the public' pending review." *Ibid.* (quoting *Scripps-Howard Radio, Inc.* v. *FCC*, 316 U. S. 4, 9 (1942)). Hence, even if an applicant is likely to succeed on the merits of their legal claims, we also ask whether they have demonstrated irreparable harm. *Hollingsworth*, 558 U. S., at 190. In addition, the successful stay applicant must show that the harm they would face from not receiving a stay is greater than the harm that the opposing party would face if a stay were granted, as well as that the requested stay is in the public interest. See *ibid.*; *Nken*, 556 U. S., at 434. Where, as here, the Government is a party, the balance-of-the-equities and public-interest factors merge. *Id.*, at 435.

Notably, if the court of appeals has already denied the request for a stay, the applicant bears an "'especially heavy burden'" to receive a stay from *this* Court. *Edwards* v. *Hope Medical Group for Women*, 512 U. S. 1301, 1302 (1994) (Scalia, J., in chambers) (quoting *Packwood* v. *Senate Select Comm. on Ethics*, 510 U. S. 1319, 1320 (1994) (Rehnquist, C. J., in chambers)). We have long viewed such an intervention as "extraordinary." *Graves* v. *Barnes*, 405 U. S. 1201, 1203 (1972) (Powell, J., in chambers) (explaining that stays pending appeal from this Court "are granted only in extraordinary circumstances"). Consequently, we have deemed the irreparable-harm showing indispensable. *Ibid.* Indeed, "[a]n applicant's likelihood of success on the merits need not [even] be considered . . . if the applicant fails to show irreparable injury from the denial of the stay." *Ruckelshaus* v. *Monsanto Co.*, 463 U. S. 1315, 1317 (1983) (Blackmun, J., in chambers); see also, *e.g.*, *Rubin* v. *United States*, 524 U. S. 1301 (1998) (Rehnquist, C. J., in chambers).

The bottom line is this: Our decision to issue a stay (or not) involves more—*much* more—than merely forecasting the eventual victor; after all, the underlying litigation is designed for and dedicated to determining *that*. What stays

are about, at their core, is an equitable assessment of who will be harmed, and to what extent, during the litigation process, with the ultimate goal of reducing the real-world consequences of the unavoidable, pending-case-related delay.

## II

In this case, the Government has plainly failed to satisfy its burden of demonstrating irreparable harm. *Nken*, 556 U. S., at 433–434. DHS contends that the District Court's order prevents it from exercising its prerogatives with respect to immigration and foreign policy, as a general matter. Application for Stay 24. But it does not establish an urgent need to effectuate blanket CHNV parole terminations *now*, before the courts can determine whether that en masse agency action is lawful. For instance, the agency does not identify any specific national-security threat or foreign-policy problem that will result from respecting extant grants of CHNV parole while this case is pending. Moreover, as the Government admits, DHS retains the ability to terminate CHNV parole on a case-by-case basis should such a particular need arise, consistent with the District Court's order. *Id.*, at 26. The lack of any concrete or irreparable injury to the Government from having to wait to claim its (assumed) victory is especially salient in light of the First Circuit's willingness to expedite its consideration of the merits of this matter—an invitation that the Government eschewed for more than three weeks.

The Government's failure to show irreparable harm should end the inquiry; its stay application fails on that basis alone. See *Ruckelshaus*, 463 U. S., at 1316–1317. But an evaluation of the balance-of-the-equities factor provides an additional reason why our intervention staying the District Court's order is not appropriate.

Respondents have shown that tangible, imminent, and significant harm is likely to befall them if this Court grants

the application and issues a stay. A stay would "immediately effectuate the *en masse* truncation of all parole grants for approximately 500,000 current CHNV parole beneficiaries in the United States." Opposition to Stay 16. Many parole recipients arrived here (at the invitation of the U. S. Government) because their home countries were afflicted by strife or they were otherwise subject to unsafe living or working conditions. Parolees have sponsors here and, in many cases, have integrated into American neighborhoods and communities in the hopes of eventually securing long-term legal status (*e.g.*, asylum). No one disputes that social and economic chaos will ensue if that many noncitizen parolees are suddenly and summarily remanded.

Respondents now face two unbearable options. On the one hand, they could elect to leave the United States and, thereby, confront "dangers in their native countries," experience destructive "family separation," and possibly "forfei[t] any opportunity to obtain a remedy based on their . . . claims," as the District Court found. App. 18a. On the other, they could remain in the United States after parole termination and risk imminent removal at the hands of Government agents, along with its serious attendant consequences. See *id.*, at 19a (confirming that respondents "may be subject to arrest and detention," "will no longer be authorized to work legally in this country," and will lose "opportunities to seek any adjustment of status").

Either choice creates significant problems for respondents that far exceed any harm to the Government, should this Court decline the stay request. Both options might also deprive this Court of jurisdiction to decide respondents' pending claims. At a minimum, granting the stay would facilitate needless human suffering before the courts have reached a final judgment regarding the legal arguments at issue, while denying the Government's application would not have anything close to that kind of practical impact.

\*    \*    \*

With the stakes as high as they are in this case, measured in terms of real harm to real people, one might reasonably expect the Government to step up to equity's scale with a mountain of harm-related arguments, bolstered by evidence. The Government bears the burden of showing why it, or the public, will be irreparably injured should it be prevented from exercising its policy preferences *now*—*i.e.*, while the lawfulness of this agency action is being litigated. This Court has repeatedly denied similar stay requests from federal agencies in recent years, unmoved by the bald contention that the Government is irreparably harmed whenever its "substantial interest in carrying out the President's policies," Application for Stay 24, is burdened. See, *e.g.*, Application in *Biden* v. *Texas*, No. 21A21, p. 4 (arguing that an injunction forcing the Government to comply with Migrant Protection Protocols (MPP) "imposes a severe and unwarranted burden on Executive authority over immigration policy and foreign affairs by ordering the government to precipitously re-implement a discretionary program that the Secretary has determined was critically flawed"); *Biden* v. *Texas*, 594 U. S. \_\_\_ (2021) (denying the Government's application for a stay of the lower court's MPP-related injunction); see also Application in *United States* v. *Texas*, No. 22A17, p. 38 (contending that the vacatur of a DHS Guidance document "causes irreparable harm to [DHS] by interfering with its authority to exercise [immigration] enforcement discretion and allocate resources toward [the Secretary's] priorities" (internal quotation marks omitted; some alterations in original)); *United States* v. *Texas*, 597 U. S. \_\_\_ (2022) (denying application for a stay).

The Government says no more than that today. Yet, somehow, the Court has now apparently determined that the equity balance weighs in the Government's favor, and, I suppose, that it is in the public's interest to have the lives of half a million migrants unravel all around us before the

courts decide their legal claims. Even assuming a likelihood that the law permits the Government to terminate parole grants in this fashion, I would let the courts decide that highly consequential legal issue first—consistent with standard stay practices and, especially, the necessary harm-centered focus. Instead, the Court allows the Government to do what it wants to do regardless, rendering constraints of law irrelevant and unleashing devastation in the process.